JAMES KLOHN, ESQ - 11/05/2018

```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                      ORLANDO DIVISION

 3            CASE NO.:  6:17-CV-01467-RBD-DCI

 4

 5
      WESTGATE RESORTS, LTD., a Florida
 6    limited partnership, by and through
      it's general partner WESTGATE
 7    RESORTS, INC., et al,

 8                      Plaintiffs,

 9          vs.

10    MITCHELL REED SUSSMAN, an individual,
      and MITCHELL REED SUSSMAN & ASSOCIATES,
11    a Law Firm,

12                      Defendants.
      _____/
13

14
              VIDEOTAPED DEPOSITION OF JAMES KLOHN
15

16
      DATE:            November 5, 2018
17
      TIME:            10:19 a.m.
18
      PLACE:           55 SE Osceola Street, Suite 201
19                     Stuart, Florida  34994

20    TAKEN BY:        Plaintiff

21    REPORTER:        ROBIN P. WALKER, CP, a Notary Public of
                       the State of Florida at Large
22    JOB NO.:         501649

23

24

25
```

Page 2

```
 1  APPEARANCES:
 2  FOR PLAINTIFF:
 3  GREENSPOON MARDER, LLP
    201 East Pine Street
 4  Suite 500
    Orlando, Florida  32801
 5  BY:  ELIOT NEW, ESQUIRE
 6  FOR DEFENDANT:
 7  WICKER SMITH O'HARA McCOY & FORD, PA
    390 North Orange Avenue
 8  Suite 1000
    Orlando, Florida  32801
 9  BY:  CLAY H. COWARD, ESQUIRE
10  Also Present:  Mitchell Reed Sussman, Plaintff
                       (Appeared Telephonically)
11                 Jordan M. Bruce, Videographer
                        Bruce Legal Video
12
13                I N D E X
14
15                                        PAGE
16  Direct Examination by Mr. New            4
    Cross Examination by Mr. Coward         50
17  Redirect Examination by Mr. New         53
18
19  Certificate of Oath                     55
    Certificate of Reporter                 56
20
21          E X H I B I T S
22  Plaintiff's Exhibit No. 1               16
    (Subpoena Duces Tecum)
23  Plaintiff's Exhibit No. 2               16
    (Response to Subpoena and attachments)
24  Plaintiff's Exhibit No. 3               38
    (Copy of recorded deeds prepared by Mr. Klohn)
25
```

Page 3

```
 1
 2  AND THEREUPON:
 3          THE VIDEOGRAPHER:  Now on the video record.
 4  This begins media one of the videotaped deposition
 5  of James Klohn, Esquire, taken in the matter of
 6  Westgate Resorts, Limited, et al, versus Mitchell
 7  Reed Sussman, et al.  Taken in the U.S. District
 8  Court for the Middle District of Florida.  Today's
 9  date is November 5th, 2018, the time is 10:19 a.m.
10          The video operator is Jordan Bruce and the
11  court reporter is Robin Walker, both on behalf of
12  Epiq Reporting.  This deposition is taking place at
13  Epiq Reporting located at 55 Southeast Osceola
14  Street in Stuart, Florida.
15          Will counsel please announce their appearances
16  and who you represent.
17          MR. NEW:  Eliot New for plaintiffs.
18          MR. COWARD:  This is Clay Coward for the
19  defendants Mitchell Sussman and his law firm.
20          THE VIDEOGRAPHER:  Will the court reporter
21  please swear in the witness.
22  AND THEREUPON:
23          James Klohn,
24  called as a witness on behalf of the Plaintiff herein,
25  after having been first duly sworn, was examined and
```

Page 4

```
 1  testified as follows:
 2          THE WITNESS:  I do.
 3          MR. NEW:  Just real quick before we start, I
 4  think I was told Mr. Sussman is on the phone; is
 5  that correct?
 6          MR. COWARD:  He is on the phone, I believe.
 7  Mr. Sussman, are you on the phone?
 8          MR. SUSSMAN:  Yes, I am.
 9          MR. COWARD:  He is listening.
10          MR. NEW:  Is anybody else on the phone?
11              DIRECT EXAMINATION
12  BY MR. NEW:
13      Q    State your name for the record, please.
14      A    James A. Klohn, K-l-o-h-n.
15      Q    Do you go by James or Jim?
16      A    Jim is fine.
17      Q    Have you ever given a deposition before?
18      A    Yes.
19      Q    A few ground rule, hopefully make this go a
20  little smoother and a little bit faster even though
21  you've done it before it tends to help.  Obviously we
22  have a court reporter here writing down everything that
23  everybody says, for that reason, you have to answer
24  questions out loud and in English.  No uh-huhs and uh-uhs
25  or head shakes, we all know what you're saying but it
```

Page 5

```
 1  doesn't translate very well.
 2      A    Got it.
 3      Q    We also can't talk at the same time.  You're
 4  doing a good job of that.  If you'll let me finish asking
 5  my question before you begin answering it, that way we're
 6  not talking at the same time, she can write it all down.
 7      A    Perfect.
 8      Q    I suspect you will be here for a couple of
 9  hours but I do not think we'll be here all day.  That's
10  not my goal, I'd like to get you out of here, but if you
11  need a break for any reason, just let us know and we'll
12  take a break.
13      A    Got it.
14      Q    The most important thing that I want you to
15  remember about today is if you do not understand my
16  question for any reason, please let me know.  You can ask
17  me to rephrase.  You can tell me it was a dumb question.
18  You can tell me I don't understand.  However, it is that
19  you communicate to me you don't understand, I'll ask the
20  question again; can you do that?
21      A    Okay.
22      Q    How many times have you given deposition
23  testimony in the past?  Approximate is fine.
24      A    More than one, less than type five.
25      Q    What were the nature of those lawsuits where
```

JAMES KLOHN, ESQ - 11/05/2018          Pages 6..9

Page 6

1  you provided deposition testimony?
2       A    I believe all of them -- no, that's not true.
3  A couple of them were when I was --
4            MR. NEW:  You need to put your mic on.
5            THE WITNESS:  A couple of them when I was
6       in-house counsel, and I think they all were when I
7       was in-house counsel for various companies.
8  BY MR. NEW:
9       Q    And they all, however many there were related
10  to whatever business it was that you were serving as
11  in-house counsel for?
12       A    That's correct.
13       Q    Let's talk about that briefly.  Right now, are
14  you employed by anyone?
15       A    I am not.
16       Q    You're self employed?
17       A    I'm self-employed.
18       Q    Do you have a specific entity that is your law
19  practice or you just --
20       A    I'm a sole proprietor but it's James A. Klohn
21  and Associates, P.A.
22       Q    Is that located here in Stuart?
23       A    Yes.
24       Q    And how long have you been operating that sole
25  proprietorship?

Page 7

1       A    2010.
2       Q    Since 2010 up to the present, have you had
3  other employment beyond or in addition to or separate
4  from your sole proprietorship?
5       A    Only 1099 positions.
6       Q    And for whom have you had significant 1090
7  positions?
8            I don't mean like a one-time $500 bill but
9  ongoing work.
10       A    Wood Bridge Structured Funding, LLC.
11       Q    How long have you been doing work for them?
12       A    It was around four years, four and a half
13  years.
14       Q    And was that where you were, as you descried,
15  in-house counsel?
16       A    That was one of them, yes.
17       Q    Where else have you been in-house counsel?
18       A    Atlantic Housing Group, L.L.L.P.; Imperial
19  Structured Settlements, LLC, and First Provident, LLC.
20       Q    Were those all since 2010?
21       A    No, those are since 2000.
22       Q    So the Atlantic Housing, Imperial and First
23  Provident all predated your sole proprietorship?
24       A    That specific entity, yes.
25       Q    Did any of those in-house positions, as you

Page 8

1  described them, involve timeshares or any type of work
2  relating to time shares?
3       A    No.
4       Q    Prior to 2010 and your current sole
5  proprietorship, what was your primary employment?
6       A    I work in the structured settlement and lottery
7  factoring transfer industry.
8       Q    As a lawyer?
9       A    Yes.
10       Q    Did you work for a specific company or
11  companies or were those the ones --
12       A    Those would be the ones.  I take that back,
13  Atlantic Housing, L.L.L.P. was a -- how do I describe
14  them?
15            They were part of Concord Management and they
16  built income-restricted housing, so they were a
17  developer.  They're the ones that were in the factoring
18  industry.
19       Q    None of them had anything to do with timeshares
20  or anything?
21       A    No.
22       Q    Timeshare related?
23       A    No.
24       Q    We kind of glossed over this but you are a
25  lawyer, correct?

Page 9

1       A    Yes.
2       Q    Are you licensed in the State of Florida?
3       A    Yes.
4       Q    Any other licenses?
5       A    No.
6       Q    Approximately when did you get licensed in
7  Florida?
8       A    November, 1998.
9       Q    Where did you go to law school?
10       A    Thomas Cooley Law School in Lansing,
11  Michigan.
12       Q    Did you come straight to Florida after law
13  school?
14       A    Actually I was in Florida before I went to law
15  school.
16       Q    So you moved back home after law school?
17       A    No, I got in there faster than other colleges,
18  so my wife and I decided I should go back to school when
19  I was 30 years old, so...
20       Q    Did you ever take the Michigan Bar?
21       A    No.
22       Q    You never had the intent of staying in
23  Michigan?  You were always planning to come back to
24  Florida?
25       A    Absolutely, too cold up there.

JAMES KLOHN, ESQ - 11/05/2018          Pages 10..13

Page 10

1     Q    I agree.  What is your current address?
2     A    Office or --
3     Q    Wherever you can be found.
4     A    941 Southeast Central Parkway, Stuart, Florida,
5  34994.
6     Q    Did you graduate law school 1997, 1998,
7  somewhere around there?
8     A    Graduated?
9     Q    Yes.
10    A    April of '98.
11    Q    You got a license in Florida, moved to Florida,
12  did work in structured settlements, lottery factoring and
13  with this low income housing developer; is that generally
14  your work experience?
15    A    Yeah.  I mean, I've done other stuff in between
16  here and there helping people out, but for the most part,
17  yes.
18    Q    And I like the way you answered that.  That
19  would be the bulk of your work experience even though you
20  may have got a one-off job for someone else?
21    A    Correct.
22    Q    What types of work are you doing now?  And you
23  can tell me it's the same as what you've already
24  described.
25    A    The same.

Page 11

1     Q    But you are doing some work with Mitchell
2  Sussman, correct?
3     A    Correct.
4     Q    How did you come to know Mr. Sussman?
5     A    I believe I answered an ad he had with the
6  Florida Bar.
7     Q    Do you recall what the ad was seeking?
8     A    Florida attorney to draft deeds, I believe.
9     Q    And approximately when was that you got in
10  touch with Mr. Sussman?
11    A    I'm just guessing but I'm going to say late
12  2016, early 2017.
13    Q    And at that time prior to actually starting any
14  work with Mr. Sussman, did you have any experience
15  preparing deeds?
16    A    Yes.
17    Q    And where was it that you had work that you got
18  experience working with deeds?
19    A    Well, I've done it on my own and I was also at
20  one time a member of the Attorneys Title Insurance Fund
21  and I'm also a Florida real estate broker.
22    Q    When you got in touch with Mr. Sussman in late
23  2016 or early 2017, had you had any dealings with
24  timeshares prior to that?
25    A    Other than just personal knowledge, no.

Page 12

1     Q    And your personal knowledge, was it beyond sort
2  of a lay person's knowledge or was it generalized?
3     A    Generalized, maybe a little bit above the lay
4  person.
5     Q    Have you ever been a timeshare owner?
6     A    No.
7     Q    Other than the work that you do with Mr.
8  Sussman, have you had any other dealings with timeshare
9  companies or timeshare interests?
10    A    To my knowledge, no.
11    Q    When you got in touch with Mr. Sussman in late
12  2016 or early 2017, was that a telephone conversation?
13  Was it an e-mail?  How did that come about?
14    A    I believe it was telephone.
15    Q    What do you recall that the two of you
16  discussed?
17    A    Drafting Florida quitclaim deeds.
18    Q    Did he tell you anything more specific about
19  the types of deeds involved?
20    A    Just that they were timeshare customers looking
21  to leave their timeshare, and by then I was seeing all
22  the commercials and everything so...
23    Q    Did Mr. Sussman tell you that these would be
24  for Timeshare Exit Team?
25    A    He never mentioned any specific company.

Page 13

1     Q    When you think back to that time and the fact
2  that you were seeing commercials, as you say, were those
3  commercials for Timeshare Exit Team?
4     A    I see them all the time now so I'm not sure.
5  It could have been.  I don't know.
6     Q    I ask because it seems to be a relatively new
7  phenomenon that these companies are on TV, but you don't
8  have any recollections as you sit here today?
9     A    It could have been any one of those companies,
10  so, yeah, I can't remember.
11    Q    Did you all talk about, you all meaning you and
12  Mr. Sussman, talk about from whom these deeds would be
13  transferred and to whom they would be going, or was it
14  just generally I need you to prepare quitclaim deeds in
15  Florida for timesharers?
16    A    They would provide me with the information and
17  I would prepare a quitclaim deed.
18    Q    And I'm talking before -- when you first talked
19  to Mr. Sussman, before you guys actually had a contract,
20  was there any more specific discussion about who would be
21  signing the deeds and to whom the deeds would be going?
22    A    Discussion about it?
23    Q    Or comments or statements or information
24  provided, any type of conversation.
25    A    Not that I recall.  I just presumed they were

Page 14

1  being signed by the people looking to leave their
2  timeshare.
3      Q     Did you have any sense at that time as to where
4  these timeshare interests would be transferred; for
5  example, to other people; to individuals purchasing the
6  time share interest; Any sense at all as to the grantees
7  for these deeds?
8      A     Back to the developer or the timeshare owner.
9      Q     Was there something specific that led you to
10  believe these were going to go -- these deeds were going
11  to transfer the interest back to the timeshare
12  developers?
13      A     Yeah, viewing the prior deed and the
14  information they provided me.
15      Q     So Mr. Sussman had provided you an example of
16  the type of deed that he was looking for?
17      A     No, they provided me the prior deed.
18      Q     So the original deed from the timeshare
19  owners -- excuse me, from the timeshare developer to the
20  timeshare owner is what you're referring to?
21      A     Correct.
22      Q     And I'm assuming that that came later in the
23  process, that that wasn't something that you and Mr.
24  Sussman talked about when you guys were first setting up
25  this relationship?

Page 15

1      A     Correct.
2      Q     Again, when you were setting up this
3  relationship, were you given any further information
4  about the circumstances surrounding the transfers that
5  were going to be made through these deeds that you were
6  going to be drafting?
7      A     Other than people no longer could afford them
8  or didn't want them, no.
9      Q     When you and Mr. Sussman were setting up this
10  relationship, was there any discussion about the
11  consideration that would be paid or given in exchange for
12  these deeds?
13      A     Yes.
14      Q     What was -- what was the details of that
15  conversation, that discussion?
16      A     $50 a quitclaim deed.
17      Q     That's what you would be paid, correct?
18      A     Yeah.
19      Q     Was there any discussion about the
20  consideration between the parties to the deed?
21      A     No.
22      Q     Any other discussions or information that you
23  recall being exchanged when you and Mr. Sussman were
24  setting up this relationship?
25      A     Regarding?

Page 16

1      Q     Anything that has to do with this relationship
2  with Mr. Sussman?
3      A     No, not really.
4      MR. NEW:  Sorry, I don't have copies of
5  everything.  I don't think you're going to need it.
6      MR. COWARD:  It's always good as we go forward
7  to have a copies for the other person, but I get it,
8  maybe you didn't expect me to be here.
9      (Marked for identification as Plaintiff's
10  Exhibit No. 1.)
11  BY MR. NEW:
12      Q     Mr. Klohn, I've handed you Exhibit No. 1 and
13  Exhibit No. 2.  Exhibit No. 1, is that a subpoena asking
14  for documents that was served on you in this case?
15      A     Correct.
16      Q     Exhibit No. 2, is that your response to the
17  subpoena?
18      A     It appears so, yes.
19      Q     And attached to that response is a Local
20  Counsel Agreement and then several of what appear to be
21  invoices you submitted to Mr. Sussman; is that correct?
22      A     Correct.
23      Q     Were any of other documents provided by you in
24  response to that subpoena?
25      A     I don't think so, no.

Page 17

1      Q     It's my understanding that you asserted
2  attorney-client privilege in response to some of the
3  requests in that subpoena; is that right?
4      A     That's correct.
5      MR. COWARD:  It looks like work product.
6      MR. NEW:  And work product, okay.
7  BY MR. NEW:
8      Q     On the attorney-client privilege, whom is the
9  client on whose behalf you're asserting the privilege?
10      A     I would say Mitchell Sussman and his clients.
11      Q     So your client is Mitchell Sussman and Mitchell
12  Sussman's clients?
13      A     Correct.
14      Q     What was the nature of any legal advice that
15  you provided to Mr. Sussman?
16      A     Legal advice?
17      Q     Just the nature of it.  I'm not asking you what
18  you told him, but if he was your client and that
19  presupposes you were providing legal advice to him, what
20  was the nature of the legal advice you were providing?
21      A     I would say the construction of the quitclaim
22  deeds and for his clients.
23      Q     I was going to ask you that as a separate
24  question.  So to the extent you were providing services
25  to Sussman's clients, what was the nature of those legal

JAMES KLOHN, ESQ - 11/05/2018        Pages 18..21

Page 18

1  services?
2      MR. COWARD:  Objection, asked and answered, but
3  you can go ahead.
4      THE WITNESS:  To Mr. Sussman for the quitclaim
5  deeds and for his clients.
6  BY MR. NEW:
7      Q     Were there any other topics or issues on which
8  you were providing legal advice to Mr. Sussman or to his
9  clients?
10     A     Not that I recall.
11     Q     What types of communications did you have with
12  Mr. Sussman that you were claiming were privileged; for
13  example, are you referring to e-mails or letters or some
14  other type of communications?
15     A     They would be e-mails and telephonic.
16     Q     And did you ever have direct communications
17  with any of Mr. Sussman's clients?
18     A     No.
19     Q     Were you also asserting that any of the
20  documents requested in that subpoena were exempt from
21  discovery pursuant to the work-product exemption or
22  doctrine?
23     A     Yes.
24     Q     As a lawyer, is it your understanding that
25  anticipation must exist for litigation in order for there

Page 19

1  to be a work-product exemption or privilege?
2      A     Sure.
3      MR. COWARD:  Form objection, predicate.
4      MR. NEW:  You can answer.
5      THE WITNESS:  Sure.
6  BY MR. NEW:
7      Q     What litigation did you anticipate for which
8  you are asserting a work-product exemption of
9  privilege?
10     A     As an attorney, you always anticipate something
11  may happen and someone may want to litigate.  Nothing
12  specific in mind.
13     Q     What types of documents are you withholding
14  based on the work-product exemption or privilege?
15     A     I would say they would be almost exclusively
16  e-mails and drafts of deeds.
17     Q     This Local Counsel Agreement, is this the
18  written agreement that governed the working relationship
19  between you and Mr. Sussman?
20     A     It is.
21     Q     Were there any prior agreements or subsequent
22  agreements?
23     A     None.
24     Q     As far as you know, did all of the work that
25  you did with or for Mr. Sussman get done pursuant to this

Page 20

1  agreement?
2      A     Yes.
3      Q     Did Mr. Sussman give you any information as to
4  why he needed or wanted to hire a local attorney to do
5  this work?
6      A     I think he said that he checked with the
7  Florida Bar and they said he needed to hire a Florida
8  attorney to draft the deeds for him.
9      Q     Did you ever independently verify that?
10     A     No.
11     Q     In your experience in working with deeds, as
12  you testified to earlier and as a lawyer in the State of
13  Florida, do you know that to be true or untrue?
14     A     I mean, someone can always go on Home Depot or
15  something and get a package and do their own quitclaim
16  deed or go on Legal Zoom and hire an attorney on Legal
17  Zoom to do a quitclaim deed or -- it's kind of a gray
18  area, but I think to be safe and above board it's
19  probably best to have an attorney draft them, but I don't
20  think you necessarily need to have, quote, unquote, an
21  attorney draft them if you have one done that's approved
22  by the Supreme Court of Florida.
23     Q     When you embarked on preparing these deeds for
24  or in connection with Mr. Sussman, did he give you any
25  examples to follow?

Page 21

1      A     He provided me a prototype, which I reviewed
2  and made sure it was compliant.
3      Q     Do you know who prepared the prototype?
4      A     I do not.
5      Q     And when you say you reviewed it, do you recall
6  making any changes to it?
7      A     Geez, I'm sure I did but I don't remember
8  making any real substantive changes.
9      Q     So this Local Counsel Agreement, it says that
10  if I'm reading this correctly, your office will
11  accommodate administrative tasks, incidental to drafts or
12  * making phone calls, correspondences with clients, which
13  I assume is Sussman's client; is that your understanding
14  of how this agreement works?
15     A     No, it was just with Sussman's people.
16     Q     Okay.  So Sussman's or his office would have
17  been responsible forgetting in touch with his clients?
18     A     Correct.
19     Q     Were you going to be responsible for actually
20  recording executed deeds?
21     A     Nope.
22     Q     Who did that work, if you know?
23     A     I have no idea.
24     Q     Now this Local Counsel Agreement says that
25  Mitchell Sussman's office, the firm, would do that under

Page 22

1  1(e).
2      A    I would presume so.
3      Q    And I think you told us earlier that you were
4  to be paid $50 per deed that you prepared and that's here
5  in this Local Counsel Agreement, correct?
6      A    Yes, I believe it is.  I haven't looked at it
7  in a while.
8      Q    In terms of you being paid, I know you've
9  produced several invoices.  Has Mr. Sussman or his law
10 firm always paid you for the work you've invoiced?
11     A    Yes.
12     Q    And you're still working with them today?
13     A    Yes.
14     Q    Is it still $50 per deed?
15     A    Yes.
16     Q    So this Local Counsel Agreement also includes a
17 confidentiality provision, and I'm not asking you what
18 the information is but my question to you is has Mr.
19 Sussman ever provided information to you that you
20 consider to be confidential information subject to that
21 provision?
22     A    Not that I recall other than his client's
23 information.
24     Q    No proprietary processes or secrets or anything
25 like that?

Page 23

1      A    No.
2      Q    Now in responding to that subpoena that I've
3  given you, Exhibit No. 1, and your response to Exhibit
4  No. 2, did you have any communications with Mr. Sussman
5  about responding to that?
6      A    Yeah, we talked briefly.
7      Q    Did he give you any instructions on how to
8  respond?
9          MR. COWARD:  So that would appear to be covered
10 by the work-product privilege in this case, and as
11 Mr. Sussman's lawyer, I would ask the witness not to
12 answer that question under the basis of the
13 work-product privilege.
14         THE WITNESS:  So I'll invoke the privilege.
15 BY MR. NEW:
16     Q    As you sit here today, do you consider Mr.
17 Coward to be your attorney for purposes of representing
18 you at this deposition?
19     A    No.
20     Q    What did you and Mr. Coward talk about prior to
21 starting this deposition?
22     A    He was pretty much just inquiring about me
23 because I guess he's kind of new to the case, so I just
24 kind of brought him up to speed.
25     Q    In connection with your work with Mr. Sussman

Page 24

1  or just as a human being?
2      A    Both in general, just, you know, he's asking me
3  what I did and so I just, you know, told him.
4      Q    You said it was your anniversary weekend.  I
5  didn't know if you were talking about that or fishing or
6  what.
7      A    Some things remain private.
8      Q    Once you had this Local Counsel Agreement with
9  Mr. Sussman, and I'm not going to ask about every
10 single time you did a deed, but let's talk about the
11 first time you did a deed; how did that assignment or
12 that task come to you?
13     A    Via e-mail.
14     Q    Who e-mailed you?
15     A    Boy --
16     Q    Let's start with, was it Mr. Sussman or was it
17 somebody else?
18     A    No, someone in his office.
19     Q    And what was the nature of the e-mail or what
20 was the substance of the e-mail as you recall?
21     A    Hello, Mr. Klohn, please draft a quitclaim
22 deed.  Please attached a private deed.  Our client
23 is so and so and their address is below.  That's it.
24     Q    And from that e-mail correspondence, you knew
25 to prepare a quitclaim deed to transfer the timeshare

Page 25

1  interest from the current timeshare owner back to the
2  timeshare developer, correct?
3      A    I don't know if it would get that far, I just
4  prepared the deed, but, yes.
5      Q    That's the deed you're preparing?
6      A    Correct.
7      Q    You don't know if it gets signed or if it gets
8  filed --
9      A    No idea.
10     Q    -- you just need to prepare it?
11     A    Correct.
12     Q    And based solely on the e-mail you just
13 described, you know that's your job?
14     A    Yes.
15     Q    So at that point you had already received the
16 prototype deed from Mr. Sussman and reviewed it?
17     A    Yes.
18     Q    So you already had the deed you were going to
19 use, you had already had that in place?  You knew what it
20 was going to say absent the name of the grantor and
21 grantee?
22     A    Yes, and all the other deed specifics you need
23 to change.
24     Q    All right, and we don't have to exhaustively
25 cover every one of them but what else changes in these

Page 26

1   deeds besides the grantor, the grantee and the property
2   location description?
3       A    The book page, recording number on the prior
4   deed, the timeshare unit, the week unit, book and page of
5   the timeshare documents, parcel identification number if
6   any available.
7       Q    All things that describe the real estate
8   interest being transferred?
9       A    Correct.
10      Q    So we have the name of the person giving the,
11  name of the person getting it and the property
12  description; those are the things that change, correct?
13      A    Correct.
14      Q    Now this e-mail and others like it, are these
15  e-mails that you still have in your possession
16  somewhere?
17      A    I should have most of them, yeah.
18      Q    Once this e-mail comes in to your e-mail inbox,
19  are you personally going and preparing the deeds or are
20  you sending it to someone else in your office to do
21  that?
22      A    No, I'm a lone ranger, I do it.
23      Q    So you personally open up a word document, or
24  whatever the other company is that offers word
25  processing, you input the data, is that right, the

Page 27

1   names --
2       A    Correct.
3       Q    -- the property description, et cetera?
4            What do you do once you have completed that
5   process? You've prepared the deed, what do you do?
6       A    I send it back.
7       Q    To the same person that e-mailed you
8   originally?
9       A    Correct.
10      Q    Which would be somebody you consider to be in
11  Sussman's office?
12      A    Yes.
13      Q    And do you have a record somewhere of that
14  e-mail that you sent back to Sussman's office?
15      A    I'm sure I do.
16      Q    Other than the deed conveying the time share
17  interest from the timeshare developer to Mr. Sussman's
18  client, do you receive any other documents in order to be
19  able to do your function as it relates to these deeds?
20      A    You mean besides the prior deed?
21      Q    Correct.
22      A    Only saying if it was a husband and wife and
23  one of them has passed away, I also received the death
24  certificate.
25      Q    Maybe divorce papers or something like that;

Page 28

1   would that even be pertinent?
2       A    It would be.
3       Q    So you get the original deed or the prior deed
4   and then any death or marriage or divorce-related
5   paperwork?
6       A    Yeah, or if another deed, say three people
7   owned it and one of them dropped out prior to them
8   sending it to me.
9       Q    Other than those categories of documents, any
10  other documents you would be receiving from Sussman or
11  his office?
12      A    No.
13      Q    And as a general rule, those documents would be
14  attached to the initial e-mail you would receive from Mr.
15  Sussman's office?
16      A    That's correct. And if they weren't and I
17  needed them, I would request them.
18      Q    Were there occasions where you did not receive
19  adequate documentation to be able to prepare the deed?
20      A    A couple of times but it was rare. Usually
21  death certificates.
22      Q    And when you needed documents, for example, as
23  you described, you need a death certificate, whatever the
24  case may be, how do you go about communicating that to
25  Mr. Sussman's office?

Page 29

1       A    It appears you forgot to send me the death
2   certificate, please send it.
3       Q    You do that by e-mail?
4       A    Yes.
5       Q    To whoever e-mailed you in the first place?
6       A    Correct.
7       Q    The individuals that in your mind were working
8   in Sussman's office or with him that were sending you
9   these deeds to be done, did they have sort of the all --
10  all have the same e-mail domain?
11      A    I really only dealt with one person, except in
12  the very beginning it was a couple of e-mails from
13  another guy but I don't recall the domains.
14      Q    Who is your primary person that you deal
15  with?
16      A    Her name is Yanni.
17      Q    I remember you said there was another guy that
18  you dealt with at the very beginning.
19      A    Yeah, I don't remember his name.
20      Q    Was that a limited nature or did you have a lot
21  of dealing with that guy?
22      A    It was limited.
23      Q    What is your understanding, if any, about what
24  Ms. Yanni Buckley does for Mr. Sussman?
25      A    I mean, I would just be presuming that she's

Page 30

1  admin. assistance.
2       Q     Other than the e-mails she sends you with
3  information to prepare a deed and any questions you might
4  send her back, which we discussed, do you have any other
5  dealings with her?
6       A     None.
7       Q     Have their been any occasions where you had to
8  deal with Mr. Sussman after this relationship was already
9  set up and other than whatever conversations or
10 communications you had relating to your subpoena?
11      A     Can you repeat that?
12      Q     Sure, and just to be clear on the front end,
13 I'm not asking you about the subpoena again.
14            Have you had any situations where you had to
15 communicate directly with Mr. Sussman after you all had
16 the Local Counsel Agreement and you had everything set
17 up?
18      A     No, I don't think so.
19      Q     I'm going to ask you several people's names,
20 and if you don't know them, you don't know them.
21            Have you ever had any dealings with Jose Alex
22 Gomez?
23      A     You know, that might have been the guy who sent
24 me the first couple e-mails.  I'm not sure though.
25      Q     Okay, what about Jeff Murphy?

Page 31

1       A     I think, and I'm not sure so I'm just stating
2  what I know or think I may know, but I think he's
3  e-mailed me once to revise a deed that had some technical
4  glitches.
5       Q     Do you remember what the nature of those
6  technical glitches were?
7       A     I -- I don't know, the week unit or something
8  may have been wrong or something like that.
9       Q     Something related to the property
10 description?
11      A     Correct.  I think, I'm not sure.
12      Q     For example, whether it was Jeff Murphy or
13 somebody else, if someone you'd never dealt with
14 contacted you from Mr. Sussman's office, how would you
15 know that they were in any way associated with or
16 affiliated with his office?
17      A     Um, they would cc him, so if I had any reason
18 to think otherwise, I could just call him or e-mail
19 him.
20      Q     And Mr. Sussman's e-mail address, as I
21 understand it, was raven t-v, maybe he had some numbers
22 at the end of it, at.aol; is that your understanding?
23      A     Yeah.
24      Q     Do you know of anyone else used that type of
25 nomenclature maybe with a different number after the

Page 32

1  raven t-v, so maybe raven t-v two or raven t-v eight?
2       A     Do I?
3       Q     Yes.
4       A     No.
5       Q     Have you ever had any dealing with Fawn
6  Weaver?
7       A     It doesn't sound familiar, no.
8       Q     Have you ever had any dealings with Tom
9  Stanford?
10      A     It doesn't sound familiar, no.
11      Q     Have you ever have any dealings with Steve
12 Peyton?
13      A     It doesn't sound familiar, no.
14      Q     Have you ever had any dealings with Evan Laird
15 (phonetic)?
16      A     It doesn't sound familiar, no.
17      Q     Have you ever had any dealings with Leslie
18 Benjamin?
19      A     It doesn't sound familiar, no.
20      Q     Raul Martinez?
21      A     It doesn't sound familiar, no.
22      Q     Andrea Estrada?
23      A     It doesn't sound familiar, no.
24      Q     A.J. or Amy Underwood?
25      A     It doesn't sound familiar, no.

Page 33

1       Q     James Sibilla?
2       A     It doesn't sound familiar, no.
3       Q     Miriam Goldstein?
4       A     It doesn't sound familiar, no.
5       Q     Terri Durst?
6       A     It doesn't sound familiar, no.
7       Q     Noreen Beresh?
8       A     It doesn't sound familiar, no.
9       Q     Jeffrey Corcoran (phonetic)?
10      A     Doesn't sound familiar, no.
11      Q     As I understand it, there were some other
12 lawyers who did the same or similar things that you did
13 with Mr. Sussman.  Have you ever heard of Summer
14 Williams?
15      A     I have not.
16      Q     Gerardo Ortega?
17      A     I have not.
18      Q     Daniel Stern?
19      A     I have not.
20      Q     Robert Kerr?
21      A     I have not.  Sounds like they're taking my
22 business.
23      Q     You have to get out there and hustle.
24            All of the deeds that you prepared in
25 connection with your work with Mr. Sussman were to

Page 34

1  transfer a timeshare interest back to a timeshare
2  developer, correct?
3     A   Yes.
4     Q   You never prepared any deeds in connection with
5  your work with Mr. Sussman transferring a timeshare
6  interest to an individual?
7     A   No.
8     Q   In your work preparing these deeds, did you
9  ever have any direct communications with any of the
10 companies, I think you said it was only companies, but
11 any of the companies where people who were the grantees
12 or the recipients of these deeds?
13    A   No.
14    Q   When you were preparing these deeds, did you
15 ever undertake any effort to confirm or verify whether
16 the timeshare developer or the entity to whom the
17 interest would be deeded was consenting to that
18 happening?
19    A   I did not, I just drafted deeds.
20    Q   And did you ever talk to Mr. Sussman about
21 that?
22    A   No.
23    Q   And you weren't responsible for recording the
24 deeds, correct?
25    A   Not at all.

Page 35

1     Q   And you don't even know if the deeds you
2  drafted were ever executed?
3     A   Correct.
4     Q   You certainly don't know that they were ever
5  recorded?
6     A   Correct.
7     Q   It may sound like a silly question then, but
8  you never sent copies of executed and recorded deeds to
9  any of the timeshare developers, the grantees?
10    A   That's correct.
11    Q   Have you ever come to learn from any source
12 whether or not these timeshare developers accept or
13 consent to receiving these deeds?
14    A   Not really.
15    Q   You don't know, don't care?
16    A   Yeah.
17    Q   As a Florida lawyer preparing deeds, did you
18 ever do any sort of research to confirm what the
19 requirements of a valid deed would be in the State of
20 Florida?
21    A   Not recently, but I'm sure I went through such
22 things when I was with Attorneys' Title Insurance Fund.
23    Q   Generally speaking, the grantee has to consent
24 or accept the deed, correct?
25        MR. COWARD:  Hold on, just object, incomplete

Page 36

1  hypothetical but go ahead.  I'm not asking you to
2  not answer, I'm just objecting for the record.
3  BY MR. NEW:
4     Q   For a valid deed in the State of Florida to
5  convey real property interest, does the grantee have to
6  consent or agree to accept that deed?
7        MR. COWARD:  Hold on.  Object to the form.
8  Incomplete hypothetical.  Go ahead.
9        THE WITNESS:  They don't have to sign the
10 deed.
11 BY MR. NEW:
12    Q   Do they have to be aware of it?
13       MR. COWARD:  Object to the form.
14       THE WITNESS:  I'm not sure.
15 BY MR. NEW:
16    Q   Do they have to have a mutual intent for title
17 to transfer?
18       MR. COWARD:  Object to the form.
19       THE WITNESS:  I'm not sure.
20 BY MR. NEW:
21    Q   And did you ever ask any of those questions in
22 connection with the work you were doing with Mr.
23 Sussman?
24    A   No, because I just drafted deeds, I wasn't
25 involved in the signing, notarization or recording of

Page 37

1  them.
2     Q   Once you prepared a deed and sent it to Mr.
3  Sussman's office, did any of those deeds ever get sent
4  back to you for any reason?
5     A   You mean after recording?
6     Q   No, just any time after you sent to Mr.
7  Sussman's office -- for example, earlier you told us --
8     A   Only if they wanted any changes to it, but they
9  wouldn't send the actual deed, they would tell me what
10 was wrong and I would check it and fix it and send it
11 back.
12    Q   It's your understanding that those types of
13 communications happened prior to any deed being
14 executed?
15    A   I would hope so.
16    Q   Sort of a checks and balances system, they
17 spotted something they didn't like about the way you
18 prepared it, maybe a clerical error, and they sent it
19 back?
20    A   Yeah, it's always been clerical.
21    Q   Other than that, any other occasions where
22 deeds came back to you after you had sent them to Mr.
23 Sussman's office?
24    A   Other than those occasions, no.  Even on those
25 occasions, they wouldn't send the deed, they would just

JAMES KLOHN, ESQ - 11/05/2018          Pages 38..41

Page 38

1  state what they thought was inaccurate.
2      Q   Do you need a break?
3      A   No, just stretching a little.
4      Q   We can take a break.
5      A   No, I'm good.  These old bones got to move.
6          (Marked for identification as Plaintiff's
7          Exhibit No. 3.)
8  BY MR. NEW:
9      Q   I'm showing you what's been marked as Exhibit
10 No. 3.
11     A   To my knowledge, those are deeds that have been
12 recorded in the real property records that have your name
13 on them as the person who prepared them.
14         Generally speaking, do those deeds in Exhibit
15 No. 3 appear to be deeds that you prepared.
16     A   It appears so, yes.
17     Q   That's generally the form that I would use with
18 the deeds that you were preparing?
19     A   Correct.
20     Q   Yes?
21     A   The one looked a little funny but maybe it's
22 just the way it's printed up.
23     Q   Which one is that that looks a little funny?
24     A   That one (Indicating).
25     Q   Who is the grantor?

Page 39

1      A   Salzman (phonetic).
2      Q   Are you able to provide any sort of estimate as
3  to the volume of deeds that you prepared in connection
4  with Mr. Sussman, whether it's over a monthly period or a
5  yearly period?
6      A   I mean, it would be a rough estimate but I can
7  give you a rough monthly estimate.
8      Q   Okay.
9      A   Fifteen a month.
10     Q   I know in your subpoena response you produced
11 several invoices.
12         Do you recall time the period that those
13 invoices cover or are you able to confirm?
14     A   I think they covered most, if not all, of them
15 up to that date, up to the date where I got the
16 subpoena.
17     Q   And are you comfortable that all of the
18 invoices are in there and that that would reflect the
19 number of deeds that you prepared?
20     A   I could update it because there's definitely
21 new ones.
22     Q   But as of the time of your response?
23     A   I believe so, yes.  I mean, I may have missed
24 one or two, but in general, I think that's most of them
25 if not all of them.

Page 40

1      Q   That's what I'm getting at.  You're not missing
2  a two-year period or a whole stack of invoices that you
3  couldn't find or anything like that?
4      A   No.
5      Q   So absent maybe one or two invoices being
6  missing all, the invoices you produced in response to the
7  subpoena, that's all you did for Sussman up to that
8  date?
9      A   Yes.
10     Q   Now since that subpoena response, you've
11 continued to do work with Mr. Sussman?
12     A   Correct.
13     Q   Is it at approximately the same volume,
14 approximately 15 deeds per month?
15     A   I mean, that's my rough estimate.  It might be
16 more, it might be less.  I don't know.
17     Q   The deeds that you have prepared, were these
18 all for Florida or within the State of Florida?
19     A   Oh, absolutely.
20     Q   Are they limited to specific counties in
21 Florida?
22     A   No.
23     Q   So it could be any county in Florida?
24     A   Wherever the time -- usually wherever the
25 timeshare company is located.  Of course, you're going to

Page 41

1  see most of them in Southeast Florida and Central
2  Florida.
3      Q   Each of the deeds that you prepare recite that
4  some consideration is being paid by the grantee to the
5  grantor; where would you obtain that information to be
6  included in the deed that you draft or prepare?
7      A   You mean do I know if it's been paid?
8      Q   A little bit of a different question.  Where do
9  you get that information?
10     A   They have a contract, you need to have a
11 consideration in it, so normally for a deed or other
12 simple contract you add a dollar or ten dollars as
13 consideration.
14     Q   So the recital that the grantee is paying the
15 grantor $10 for each of these deeds, that's just a number
16 you came up with or is that a number that Mr. Sussman
17 told you to use or how did that come about?
18     A   Well, $10 is a common number used in deed
19 preparation for the recital of a consideration.
20     Q   Did you, you using your knowledge that that's a
21 common number, come up with that or did someone else tell
22 you to use that number?
23     A   Well, You mean like -- Sussman didn't if that's
24 what you're asking.
25     Q   I'm just asking if anybody did.

JAMES KLOHN, ESQ - 11/05/2018          Pages 42..45

Page 42

1      A      Other than law school and classes I've taken,
2  they always said use a dollar or $10.
3      Q      Now follow-up question.  Do you know whether or
4  not the grantee with respect to these deed that you
5  prepared gave any consideration?
6      A      No idea, I don't even know if they signed it.
7      Q      Do you know whether or not for a deed in
8  Florida to validly transfer a real property interest
9  there has to be consideration given?
10         MR. COWARD:  I'm going to object to the form
11     but go ahead.
12         THE WITNESS:  I wouldn't -- I would say there
13     should always be a recital consideration.  I mean,
14     this day and age, who knows if it's valid or not.
15  BY MR. NEW:
16     Q      Beyond a recital, should there will be actual
17  consideration?
18         Whatever that consideration might be, should
19  consideration be given?
20     A      There should be something for consideration,
21  sure.
22     Q      If there's not, is the deed valid to your
23  knowledge?
24     A      That, I don't know.
25     Q      Did you ever have any concerns about the

Page 43

1  Legality of what you were doing with Mr. Sussman?
2      A      Legality of it?
3      Q      Correct.
4      A      Drafting quitclaim deeds as a Florida attorney,
5  no, I never had an issue with the legality of it.
6      Q      For that reason it's safe to assume you never
7  made any reports to any Bar associations that anything
8  might be being done improperly in connection with these
9  deeds?
10     A      Have I made any reports, no, not at all.
11     Q      Similarly, you never made any complaints or
12  reports to any governmental entities?
13     A      No.
14     Q      You never reported anything to any of the
15  transferors, the grantors, or the transferees, the
16  grantees, as it relates to any of these deeds?
17     A      None.
18     Q      I think you've told us your relationship with
19  Mr. Sussman or his law firm is ongoing, correct?
20     A      Correct.
21     Q      When was last time that you did -- prepared a
22  quitclaim deed in connection with your work with Mr.
23  Sussman?
24     A      What's today, Monday, the 5th?  Maybe Wednesday
25  or Thursday.  It might have even been Friday but I don't

Page 44

1  think so.
2      Q      Other than the e-mails between you and
3  individuals that you associate with Sussman's office and
4  the actual deeds that you've prepared, do you have any
5  other record of the grantors or grantees for whom you've
6  prepared deeds?
7      A      I do not.
8      Q      Like a master spreadsheet or master list or
9  anything like that?
10     A      Not to my knowledge.  I may have gotten one in
11  the early days but I don't think so.  It wouldn't have
12  been a master one, it would have just -- if I did get
13  one, it would have been just a small spreadsheet.
14     Q      And who would have prepared that?
15     A      That one guy that I first dealt with.
16     Q      So would that be a list of individuals for whom
17  you were supposed to be preparing deeds for as opposed to
18  here's a list of everyone you have already prepared a
19  deed for?
20     A      No, it wouldn't have been the latter if I did
21  get one.
22     Q      I guess what I'm getting at is if you did
23  receive any sort of list, like you just suggested you
24  might have, that would have been a list simply for
25  convenience because you were being sent numerous deeds to

Page 45

1  prepare, right, and here's a list of the people for whom
2  you're supposed to prepare them?
3         MR. COWARD:  Object to form.
4         THE WITNESS:  That would be the reason.
5  BY MR. NEW:
6      Q      Not here's a master list of everyone for whom
7  you've prepared a deed?
8      A      No.
9      Q      Once you invoiced Mr. Sussman or his law firm,
10  how did you get paid?
11     A      Check.
12     Q      Paper check?
13     A      Yeah.
14     Q      Dropped in the mail?
15     A      Correct, FedEx usually because I send my FedEx
16  envelope, FedEx label.  I like to get paid right away.
17     Q      Doesn't everyone?
18         How frequently would you invoice?  Was there a
19  set...
20     A      In general, weekly.  Depends on how many deeds
21  I did though.  Usually if it's less than ten, I wait
22  until the next week, the following week.
23     Q      And usually how long did it take you to get a
24  check back from FedEx?
25     A      Two, three days.

JAMES KLOHN, ESQ - 11/05/2018          Pages 46..49

Page 46

1      Q     How would you send the invoices, was that via
2  e-mail or by --
3      A     Yes.
4      Q     -- mail?
5      A     Yes, e-mail.
6      Q     So you would include a PDF, I guess, of the
7  FedEx label?
8      A     Correct.
9      Q     Just to be clear so we have a clear record, the
10 deeds that you prepared and sent to Mr. Sussman or his
11 office, you have not produced those because you're
12 claiming that those are protected by work product?
13     A     Correct.
14     Q     In terms of communications that you would have
15 had directly with Mr. Sussman, those communications all
16 would have been at the outset or the creation of your
17 relationship or whenever you talked to him about
18 responding to the subpoena; is that correct?
19     A     Yes.
20     Q     You never communicated with any of Mr.
21 Sussman's clients directly?
22     A     The people, no, none.
23     Q     Did you ever receive any complaints from any of
24 Mr. Sussman's customers or clients?
25     A     No.

Page 47

1      Q     Did anybody at Mr. Sussman's office ever
2  express any complaints to you other than, for example,
3  you mentioned some technical tweaks that needed to be
4  made to the property descriptions?
5      A     No.
6      Q     Have you received any requests from law
7  enforcement relating to any work that you performed in
8  connection with Mr. Sussman?
9      A     No.
10     Q     Have you ever received a request from any other
11 governmental bodies or agencies related to this work?
12     A     No.
13     Q     Have any of the timeshare developers ever told
14 you that they don't accept the work that you're doing for
15 Mr. Sussman or anything to that effect?
16     A     Just one.
17     Q     Berkley?
18     A     Yeah.
19     Q     When you received this letter written by my
20 firm on behalf of Berkley, what response, if any, did you
21 make?
22     A     I believe I called them and left a message but
23 we never communicated.
24     Q     You never heard back?
25     A     No.

Page 48

1      Q     Would you agree that this letter, at least as
2  to the Berkley Group, Inc., is communicating to you that
3  Berkley does not authorize, accept or consent to the
4  deeds that you're preparing?
5      A     I would think so, yeah.
6      Q     Have you continued to prepare deeds conveying
7  interest to the Berkley Group, Inc., after this letter?
8      A     I think just after I got that there may have
9  been one or two, but I haven't seen any request for
10 Berkley deals.
11     Q     In those one or two, did you go ahead and
12 prepare the deed notwithstanding the letter?
13     A     Yeah, I may have.
14     Q     You're not sure if you did or didn't?
15     A     I'm not sure of the timing of it.
16     Q     Have you ever come to be aware from any source
17 that any of these timeshare developers file notices of
18 non-acceptance once the deeds you've prepared have been
19 executed and recorded in the real property records?
20     A     Notice of non -- no, I've never heard of
21 those.
22     Q     A Notice of Non-Acceptance where the timeshare
23 developer is saying I understand that this deed has been
24 filed but I don't accept it?
25     A     No, I have not.

Page 49

1          MR. NEW:  Let's take a quick break.  I'm about
2  done.
3          THE VIDEOGRAPHER:  Off the record at 11:29.
4          (A short break was taken.)
5          THE VIDEOGRAPHER:  Back on the record at
6  11:33.
7  BY MR. NEW:
8      Q     Did Mr. Sussman or anyone in his office ever
9  communicate to you that these timeshare developers
10 consented to or accepted the deeds you were preparing?
11     A     No.
12     Q     Did they ever imply these timeshare developers
13 consented to the deeds you were preparing?
14     A     Not that I'm aware of.
15     Q     I'm assuming the answer is no but have you read
16 a transcript of Mr. Sussman's deposition?
17     A     No.
18     Q     He testified that the developers are not aware
19 that these deeds are prepared and executed and recorded
20 as a general principal; is that concerning to you?
21          MR. COWARD:  Form objection.
22          THE WITNESS:  I mean, I'm not on that end of
23 business, I just draft deeds, so...
24 BY MR. NEW:
25     Q     Now that you've been told by Berkley that they

Page 50

1  don't accept the deeds and what I just told you, and I'm
2  happy to give you a copy of his deposition if you want
3  where he testified that the developers don't know, do you
4  intend to continue preparing these deeds?
5          MR. COWARD:  Object to the form.
6          THE WITNESS:  I'm going to have to check with
7      my attorney and see.
8  BY MR. NEW:
9      Q    Have you ever made any effort to confirm which
10 of the deeds you've prepared have actually been executed
11 and recorded?
12     A    I have not.
13     Q    So as far as you know, it could have been zero
14 of them or it could have been all of them?
15     A    Correct.
16         THE WITNESS:  Excuse the cracking.
17         MR. NEW:  I'll pass the witness.
18                CROSS EXAMINATION
19 BY MR. COWARD:
20     Q    Mr. Klohn, good morning.  This is Clay Coward,
21 I represent Mr. Sussman and his law firm and I have just
22 a couple follow-up questions.  Let me see that stack of
23 documents that's marked as Exhibit 2 that you have in
24 your left hand here.
25          And the first page of this is a letter dated

Page 51

1  June 25th, 2018 to Jeffrey Backman at the law firm
2  representing the plaintiffs in this case.  It's got your
3  signature.  I'm assuming that you prepared this letter
4  and mailed it?
5      A    I believe I e-mailed it.
6      Q    Okay.  All right.  And you sent that to the
7  plaintiff's law firm in response to the subpoena for
8  documents that they -- that was marked as Exhibit 1 to
9  the deposition?
10     A    That's correct.
11     Q    Okay.  And in your letter you attached a list
12 of all the documents that they requested, and one of the
13 documents that you produce as Exhibit A was the Local
14 Counsel Agreement that Mr. New was asking you about,
15 right?
16     A    Correct.
17     Q    And by way of that document, you agreed to
18 serve as an independent contractor attorney to Mr.
19 Sussman and his law firm for the services that are
20 discussed in that document and that you've discussed here
21 today for Mr. Sussman's clients, right?
22     A    Correct.
23     Q    And in your written response to the subpoena
24 for documents, one of the questions that was requested
25 was, number three, all deeds you prepared or recorded at

Page 52

1  Sussman's behest that pertained to timeshare clients; is
2  that your handwriting there?
3      A    That's my chicken scratch, yes.
4      Q    And it says, objection, attorney-client and/or
5  work-product privilege, right?
6      A    Correct.
7      Q    And because you, as you said at the beginning
8  of this deposition, you considered that Mr. Sussman's
9  clients, who you were doing work on behalf of, to have an
10 attorney-client relationship with you in regard to the
11 work that you were doing any way as well, correct?
12     A    Correct.
13     Q    Okay, and so I think there was a question
14 towards the end of Mr. New's questioning about the basis
15 for your not providing the deeds for actual clients in
16 response to the subpoena and you put work-product
17 privilege, but you had also objected in your response to
18 the documents on the basis of the attorney-client
19 privilege and as you had said earlier in the deposition
20 here today?
21         MR. NEW:  Objection, leading.
22         THE WITNESS:  Yes.
23 BY MR. COWARD:
24     Q    Do you feel that you have an attorney-client
25 relationship with these individuals that you prepared

Page 53

1  deeds on behalf of, and one of the basis of your
2  objections to producing those documents would be
3  attorney-client privilege, true?
4          MR. NEW:  Objection leading.
5          THE WITNESS:  Yes.
6          MR. COWARD:  Okay, Mr. Klohn, thank you.
7      That's all I have.
8          THE VIDEOGRAPHER:  This concludes the
9      deposition.
10         MR. NEW:  Hang on real quick, I have follow-up
11     question.
12                REDIRECT EXAMINATION
13 BY MR. NEW:
14     Q    The deeds that you prepared for Mr. Sussman's
15 clients, you never sent those to Mr. Sussman's clients,
16 did you?
17     A    No.
18     Q    And you never communicated anything to those
19 clients about the deeds?
20     A    Correct, never.
21         MR. NEW:  Pass the witness.
22         MR. COWARD:  No, no thanks.
23         THE VIDEOGRAPHER:  That concludes the
24     deposition of James Klohn.  We're now off the video
25     record at 11:40.

JAMES KLOHN, ESQ - 11/05/2018          Pages 54..56

Page 54

1          MR. COWARD:  You have the right to read or
2     waive.
3          THE WITNESS:  Waive.
4          THE COURT REPORTER:  Would you like to order?
5          MR. NEW:  Yeah, I will order.
6          MR. COWARD:  I'll let you know if I want a
7     copy.
8          STIPULATED and AGREED by and between counsel
9     for the respective parties and the witness that the
10    signature of the witness to the deposition and the
11    reading of same be waived.
12
13         (The deposition concluded at 11:40 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 55

1     STATE OF FLORIDA   )
                         : SS
2     COUNTY OF MARTIN  )
3
4                    CERTIFICATE OF OATH
5          I, ROBIN P. WALKER, a Certified Reporter,
6     Notary Public of the State of Florida certify that James
7     Klohn personally appeared before me on the 5th day of
8     November, 2018.
9          WITNESS my hand and official seal this
10    13th day of November, 2018.
11
12
13
           ROBIN P. WALKER, CP
14         My Commission Expires:
           May 9th, 2020
15         FF# 982111
16
17
18
                              Personally Known_____
19                  Or Produced Identification__X___
            Type of Identification Produced - driver's
20                                          license
21
22
23
24
25

Page 56

1     STATE OF FLORIDA   )
                         : SS
2     COUNTY OF MARTIN  )
3
4                    CERTIFICATE
5          I, ROBIN P. WALKER, a Shorthand Reporter and
6     Notary Public of the State of Florida at Large, certify
7     that the foregoing deposition of James Klohn was
8     stenographically reported by me and is a true and
9     accurate transcription of said deposition of James Klohn.
10         I certify further I am neither attorney nor
11    counsel for, nor related to, nor employed by any of the
12    parties to the action in which the deposition is taken
13    and, further, that I am not a relative or an employee of
14    any attorney or counsel employed in this case, nor am I
15    financially interested in the outcome of this action.
16         DATED this 13th day of November, 2018.
17
18
19
20
21
22
           ROBIN P. WALKER, CP
23
24
25

**$**

**$10**
41:15,18 42:2

**$50**
15:16 22:4,14

**$500**
7:8

**1**

**1**
16:10,12,13 23:3 51:8

**1(e)**
22:1

**1090**
7:6

**1099**
7:5

**10:19**
3:9

**11:29**
49:3

**11:33**
49:6

**11:40**
53:25 54:13

**15**
40:14

**1997**
10:6

**1998**
9:8 10:6

**2**

**2**
16:13,16 23:4 50:23

**2000**
7:21

**2010**
7:1,2,20 8:4

**2016**
11:12,23 12:12

**2017**
11:12,23 12:12

**2018**
3:9 51:1

**25th**
51:1

**3**

**3**
38:7,10,15

**30**
9:19

**34994**
10:5

**5**

**55**
3:13

**5th**
3:9 43:24

**9**

**941**
10:4

**98**
10:10

**A**

**A.J.**
32:24

**a.m.**
3:9 54:13

**able**
27:19 28:19 39:2,13

**absent**
25:20 40:5

**absolutely**
9:25 40:19

**accept**
35:12,24 36:6 47:14
48:3,24 50:1

**accepted**

49:10

**accommodate**
21:11

**actual**
37:9 42:16 44:4 52:15

**ad**
11:5,7

**add**
41:12

**addition**
7:3

**address**
10:1 24:23 31:20

**adequate**
28:19

**admin**
30:1

**administrative**
21:11

**advice**
17:14,16,19,20 18:8

**affiliated**
31:16

**afford**
15:7

**age**
42:14

**agencies**
47:11

**agree**
10:1 36:6 48:1

**agreed**
51:17 54:8

**agreement**
16:20 19:17,18 20:1
21:9,14,24 22:5,16 24:8
30:16 51:14

**agreements**
19:21,22

**ahead**
18:3 36:1,8 42:11 48:11

**Alex**
30:21

**Amy**

32:24

**and/or**
52:4

**Andrea**
32:22

**anniversary**
24:4

**announce**
3:15

**answer**
4:23 19:4 23:12 36:2
49:15

**answered**
10:18 11:5 18:2

**answering**
5:5

**anticipate**
19:7,10

**anticipation**
18:25

**anybody**
4:10 41:25 47:1

**appear**
16:20 23:9 38:15

**appearances**
3:15

**appears**
16:18 29:1 38:16

**approved**
20:21

**Approximate**
5:23

**approximately**
9:6 11:9 40:13,14

**April**
10:10

**area**
20:18

**asked**
18:2

**asking**
5:4 16:13 17:17 22:17
24:2 30:13 36:1 41:24,25
51:14

JAMES KLOHN, ESQ - 11/05/2018                    i2

**asserted**
17:1

**asserting**
17:9 18:19 19:8

**assignment**
24:11

**assistance**
30:1

**associate**
44:3

**associated**
31:15

**Associates**
6:21

**associations**
43:7

**assume**
21:13 43:6

**assuming**
14:22 49:15 51:3

**at.aol**
31:22

**Atlantic**
7:18,22 8:13

**attached**
16:19 24:22 28:14 51:11

**attorney**
11:8 19:10 20:4,8,16,19,
21 23:17 43:4 50:7 51:18

**attorney-client**
17:2,8 52:4,10,18,24
53:3

**Attorneys**
11:20

**Attorneys'**
35:22

**authorize**
48:3

**available**
26:6

**aware**
36:12 48:16 49:14,18

---

**B**

---

**back**
8:12 9:16,18,23 13:1
14:8,11 25:1 27:6,14
30:4 34:1 37:4,11,19,22
45:24 47:24 49:5

**Backman**
51:1

**balances**
37:16

**Bar**
9:20 11:6 20:7 43:7

**based**
19:14 25:12

**basis**
23:12 52:14,18 53:1

**beginning**
29:12,18 52:7

**begins**
3:4

**behalf**
3:11,24 17:9 47:20 52:9
53:1

**behest**
52:1

**believe**
4:6 6:2 11:5,8 12:14
14:10 22:6 39:23 47:22
51:5

**Benjamin**
32:18

**Beresh**
33:7

**Berkley**
47:17,20 48:2,3,7,10
49:25

**best**
20:19

**beyond**
7:3 12:1 42:16

**bill**
7:8

**bit**
4:20 12:3 41:8

---

**board**
20:18

**bodies**
47:11

**bones**
38:5

**book**
26:3,4

**Boy**
24:15

**break**
5:11,12 38:2,4 49:1,4

**Bridge**
7:10

**briefly**
6:13 23:6

**broker**
11:21

**brought**
23:24

**Bruce**
3:10

**Buckley**
29:24

**built**
8:16

**bulk**
10:19

**business**
6:10 33:22 49:23

---

**C**

---

**call**
31:18

**called**
3:24 47:22

**calls**
21:12

**can't**
5:3

**care**
35:15

**case**
16:14 23:10,23 28:24

---

51:2

**categories**
28:9

**cc**
31:17

**Central**
10:4 41:1

**certainly**
35:4

**certificate**
27:24 28:23 29:2

**certificates**
28:21

**cetera**
27:3

**change**
25:23 26:12

**changes**
21:6,8 25:25 37:8

**check**
37:10 45:11,12,24 50:6

**checked**
20:6

**checks**
37:16

**chicken**
52:3

**circumstances**
15:4

**claiming**
18:12 46:12

**classes**
42:1

**Clay**
3:18 50:20

**clear**
30:12 46:9

**clerical**
37:18,20

**client**
17:9,11,18 21:13 24:22
27:18

**client's**
22:22

**clients**
17:10,12,22,25 18:5,9,17
21:12,17 46:21,24 51:21
52:1,9,15 53:15,19

**cold**
9:25

**colleges**
9:17

**come**
9:12,23 11:4 12:13 24:12
35:11 41:17,21 48:16

**comes**
26:18

**comfortable**
39:17

**comments**
13:23

**commercials**
12:22 13:2,3

**common**
41:18,21

**communicate**
5:19 30:15 49:9

**communicated**
46:20 47:23 53:18

**communicating**
28:24 48:2

**communications**
18:11,14,16 23:4 30:10
34:9 37:13 46:14,15

**companies**
6:7 8:11 12:9 13:7,9
34:10,11

**company**
8:10 12:25 26:24 40:25

**complaints**
43:11 46:23 47:2

**completed**
27:4

**compliant**
21:2

**concerning**
49:20

**concerns**
42:25

**concluded**
54:13

**concludes**
53:8,23

**Concord**
8:15

**confidential**
22:20

**confidentiality**
22:17

**confirm**
34:15 35:18 39:13 50:9

**connection**
20:24 23:25 33:25 34:4
36:22 39:3 43:8,22 47:8

**consent**
35:13,23 36:6 48:3

**consented**
49:10,13

**consenting**
34:17

**consider**
22:20 23:16 27:10

**consideration**
15:11,20 41:4,11,13,19
42:5,9,13,17,18,19,20

**considered**
52:8

**construction**
17:21

**contacted**
31:14

**continue**
50:4

**continued**
40:11 48:6

**contract**
13:19 41:10,12

**contractor**
51:18

**convenience**
44:25

**conversation**
12:12 13:24 15:15

**conversations**
30:9

**convey**
36:5

**conveying**
27:16 48:6

**Cooley**
9:10

**copies**
16:4,7 35:8

**copy**
50:2 54:7

**Corcoran**
33:9

**correct**
4:5 6:12 8:25 10:21 11:2,
3 14:21 15:1,17 16:15,
21,22 17:4,13 21:18 22:5
25:2,6,11 26:9,12,13
27:2,9,21 28:16 29:6
31:11 34:2,24 35:3,6,10,
24 38:19 40:12 43:3,19,
20 45:15 46:8,13,18
50:15 51:10,16,22 52:6,
11,12 53:20

**correctly**
21:10

**correspondence**
24:24

**correspondences**
21:12

**couldn't**
40:3

**counsel**
3:15 6:6,7,11 7:15,17
16:20 19:17 21:9,24
22:5,16 24:8 30:16 51:14
54:8

**counties**
40:20

**county**
40:23

**couple**
5:8 6:3,5 28:20 29:12
30:24 50:22

**course**
40:25

**court**
3:8,11,20 4:22 20:22
54:4

**cover**
25:25 39:13

**covered**
23:9 39:14

**Coward**
3:18 4:6,9 16:6 17:5 18:2
19:3 23:9,17,20 35:25
36:7,13,18 42:10 45:3
49:21 50:5,19,20 52:23
53:6,22 54:1,6

**cracking**
50:16

**creation**
46:16

**CROSS**
50:18

**current**
8:4 10:1 25:1

**customers**
12:20 46:24

———————

D

**Daniel**
33:18

**data**
26:25

**date**
3:9 39:15 40:8

**dated**
50:25

**day**
5:9 42:14

**days**
44:11 45:25

**deal**
29:14 30:8

**dealing**
29:21 32:5

**dealings**
11:23 12:8 30:5,21 32:8,
11,14,17

JAMES KLOHN, ESQ - 11/05/2018                    i4

**deals**
48:10

**dealt**
29:11,18 31:13 44:15

**death**
27:23 28:4,21,23 29:1

**decided**
9:18

**deed**
13:17 14:13,16,17,18
15:16,20 20:16,17 22:4,
14 24:10,11,22,25 25:4,
5,16,18,22 26:4 27:5,16,
20 28:3,6,19 30:3 31:3
35:19,24 36:4,6,10 37:2,
9,13,25 41:6,11,18 42:4,
7,22 43:22 44:19 45:7
48:12,23

**deeded**
34:17

**deeds**
11:8,15,18 12:17,19
13:12,14,21 14:7,10
15:5,12 17:22 18:5 19:16
20:8,11,23 21:20 26:1,19
27:19 29:9 33:24 34:4,8,
12,14,19,24 35:1,8,13,17
36:24 37:3,22 38:11,14,
15,18 39:3,19 40:14,17
41:3,15 43:4,9,16 44:4,6,
17,25 45:20 46:10 48:4,
6,18 49:10,13,19,23
50:1,4,10 51:25 52:15
53:1,14,19

**defendants**
3:19

**definitely**
39:20

**Depends**
45:20

**deposition**
3:4,12 4:17 5:22 6:1
23:18,21 49:16 50:2 51:9
52:8,19 53:9,24 54:10,13

**Depot**
20:14

**describe**
8:13 26:7

**described**
8:1 10:24 25:13 28:23

**descried**
7:14

**description**
26:2,12 27:3 31:10

**descriptions**
47:4

**details**
15:14

**developer**
8:17 10:13 14:8,19 25:2
27:17 34:2,16 48:23

**developers**
14:12 35:9,12 47:13
48:17 49:9,12,18 50:3

**didn't**
15:8 16:8 24:5 37:17
41:23 48:14

**different**
31:25 41:8

**direct**
4:11 18:16 34:9

**directly**
30:15 46:15,21

**discovery**
18:21

**discussed**
12:16 30:4 51:20

**discussion**
13:20,22 15:10,15,19

**discussions**
15:22

**District**
3:7,8

**divorce**
27:25

**divorce-related**
28:4

**doctrine**
18:22

**document**
26:23 51:17,20

**documentation**
28:19

**documents**
16:14,23 18:20 19:13
26:5 27:18 28:9,10,13,22
50:23 51:8,12,13,24
52:18 53:2

**doesn't**
5:1 32:7,10,13,16,19,21,
23,25 33:2,4,6,8,10
45:17

**doing**
5:4 7:11 10:22 11:1
36:22 43:1 47:14 52:9,11

**dollar**
41:12 42:2

**dollars**
41:12

**domain**
29:10

**domains**
29:13

**don't**
5:18,19 7:8 13:5,7,10
16:4,5,25 20:19 21:7
25:3,7,24 29:13,19
30:18,20 31:7 35:1,4,15
36:9 40:16 42:6,24 43:25
44:11 47:14 48:24 50:1,3

**draft**
11:8 20:8,19,21 24:21
41:6 49:23

**drafted**
34:19 35:2 36:24

**drafting**
12:17 15:6 43:4

**drafts**
19:16 21:11

**dropped**
28:7 45:14

**duly**
3:25

**dumb**
5:17

**Durst**
33:5

**E**

**e-mail**
12:13 24:13,19,20,24
25:12 26:14,18 27:14
28:14 29:3,10 31:18,20
46:2,5

**e-mailed**
24:14 27:7 29:5 31:3
51:5

**e-mails**
18:13,15 19:16 26:15
29:12 30:2,24 44:2

**earlier**
20:12 22:3 37:7 52:19

**early**
11:12,23 12:12 44:11

**effect**
47:15

**effort**
34:15 50:9

**eight**
32:1

**Eliot**
3:17

**embarked**
20:23

**employed**
6:14,16

**employment**
7:3 8:5

**enforcement**
47:7

**English**
4:24

**entities**
43:12

**entity**
6:18 7:24 34:16

**envelope**
45:16

**Epiq**
3:12,13

**error**
37:18

JAMES KLOHN, ESQ - 11/05/2018                    i5

**Esquire**
3:5

**estate**
11:21 26:7

**estimate**
39:2,6,7 40:15

**Estrada**
32:22

**et**
27:3

**et al**
3:6,7

**Evan**
32:14

**everybody**
4:23

**EXAMINATION**
4:11 50:18 53:12

**examined**
3:25

**example**
14:5,15 18:13 28:22
31:12 37:7 47:2

**examples**
20:25

**exchange**
15:11

**exchanged**
15:23

**exclusively**
19:15

**excuse**
14:19 50:16

**executed**
21:20 35:2,8 37:14 48:19
49:19 50:10

**exempt**
18:20

**exemption**
18:21 19:1,8,14

**exhaustively**
25:24

**Exhibit**
16:10,12,13,16 23:3
38:7,9,14 50:23 51:8,13

**exist**
18:25

**Exit**
12:24 13:3

**expect**
16:8

**experience**
10:14,19 11:14,18 20:11

**express**
47:2

**extent**
17:24

_____

**F**

**fact**
13:1

**factoring**
8:7,17 10:12

**familiar**
32:7,10,13,16,19,21,23,
25 33:2,4,6,8,10

**far**
19:24 25:3 50:13

**faster**
4:20 9:17

**Fawn**
32:5

**Fedex**
45:15,16,24 46:7

**feel**
52:24

**Fifteen**
39:9

**file**
48:17

**filed**
25:8 48:24

**find**
24:22 40:3

**fine**
4:16 5:23

**finish**
5:4

**firm**
3:19 21:25 22:10 43:19
45:9 47:20 50:21 51:1,7,
19

**first**
3:25 7:19,22 13:18 14:24
24:11 29:5 30:24 44:15
50:25

**fishing**
24:5

**five**
5:24

**fix**
37:10

**Florida**
3:8,14 9:2,7,12,14,24
10:4,11 11:6,8,21 12:17
13:15 20:7,13,22 35:17,
20 36:4 40:18,21,23
41:1,2 42:8 43:4

**follow**
20:25

**follow-up**
42:3 50:22 53:10

**following**
45:22

**follows**
4:1

**forgetting**
21:17

**forgot**
29:1

**form**
19:3 36:7,13,18 38:17
42:10 45:3 49:21 50:5

**forward**
16:6

**found**
10:3

**four**
7:12

**frequently**
45:18

**Friday**
43:25

**front**
30:12

**function**
27:19

**Fund**
11:20 35:22

**Funding**
7:10

**funny**
38:21,23

**further**
15:3

_____

**G**

**Geez**
21:7

**general**
24:2 28:13 39:24 45:20
49:20

**generalized**
12:2,3

**generally**
10:13 13:14 35:23 38:14,
17

**Gerardo**
33:16

**getting**
26:11 40:1 44:22

**give**
20:3,24 23:7 39:7 50:2

**given**
4:17 5:22 15:3,11 23:3
42:9,19

**giving**
26:10

**glitches**
31:4,6

**glossed**
8:24

**go**
4:15,19 9:9,18 14:10
16:6 18:3 20:14,16 28:24
36:1,8 42:11 48:11

**goal**
5:10

JAMES KLOHN, ESQ - 11/05/2018                    i6

**going**
11:11 13:13,21 14:10
15:5,6 16:5 17:23 21:19
24:9 25:18,20 26:19
30:19 40:25 42:10 50:6

**Goldstein**
33:3

**Gomez**
30:22

**good**
5:4 16:6 38:5 50:20

**gotten**
44:10

**governed**
19:18

**governmental**
43:12 47:11

**graduate**
10:6

**Graduated**
10:8

**grantee**
25:21 26:1 35:23 36:5
41:4,14 42:4

**grantees**
14:6 34:11 35:9 43:16
44:5

**grantor**
25:20 26:1 38:25 41:5,15

**grantors**
43:15 44:5

**gray**
20:17

**ground**
4:19

**Group**
7:18 48:2,7

**guess**
23:23 44:22 46:6

**guessing**
11:11

**guy**
29:13,17,21 30:23 44:15

**guys**
13:19 14:24

---

**H**

**half**
7:12

**hand**
50:24

**handed**
16:12

**handwriting**
52:2

**Hang**
53:10

**happen**
19:11

**happened**
37:13

**happening**
34:18

**happy**
50:2

**haven't**
22:6 48:9

**he's**
23:23 24:2 31:2

**head**
4:25

**heard**
33:13 47:24 48:20

**Hello**
24:21

**help**
4:21

**helping**
10:16

**here's**
44:18 45:1,6

**hire**
20:4,7,16

**Hold**
35:25 36:7

**home**
9:16 20:14

**hope**
37:15

**hopefully**
4:19

**hours**
5:9

**housing**
7:18,22 8:13,16 10:13

**human**
24:1

**husband**
27:22

**hustle**
33:23

**hypothetical**
36:1,8

---

**I**

**I'D**
5:10

**I'LL**
5:19 23:14 50:17 54:6

**I'M**
6:17,20 11:11,21 13:4,18
14:22 17:17 21:7,10
22:17 24:9 26:22 27:15
30:13,19,24 31:1,11
35:21 36:1,2,14,19 38:5,
9 40:1 41:25 42:10 44:22
48:15 49:1,14,15,22
50:1,6 51:3

**I'VE**
10:15 11:19 16:12 23:2
42:1 48:20

**idea**
21:23 25:9 42:6

**identification**
16:9 26:5 38:6

**Imperial**
7:18,22

**imply**
49:12

**important**
5:14

**improperly**
43:8

**in-house**

6:6,7,11 7:15,17,25

**inaccurate**
38:1

**inbox**
26:18

**incidental**
21:11

**include**
46:6

**included**
41:6

**includes**
22:16

**income**
10:13

**income-restricted**
8:16

**incomplete**
35:25 36:8

**independent**
51:18

**independently**
20:9

**Indicating**
38:24

**individual**
34:6

**individuals**
14:5 29:7 44:3,16 52:25

**industry**
8:7,18

**information**
13:16,23 14:14 15:3,22
20:3 22:18,19,20,23 30:3
41:5,9

**initial**
28:14

**input**
26:25

**inquiring**
23:22

**instructions**
23:7

**Insurance**

11:20 35:22

**intend**
50:4

**intent**
9:22 36:16

**interest**
14:6,11 25:1 26:8 27:17
34:1,6,17 36:5 42:8 48:7

**interests**
12:9 14:4

**invoice**
45:18

**invoiced**
22:10 45:9

**invoices**
16:21 22:9 39:11,13,18
40:2,5,6 46:1

**invoke**
23:14

**involve**
8:1

**involved**
12:19 36:25

**issue**
43:5

**issues**
18:7

**it's**
6:20 10:23 16:6 17:1
20:17,18 37:12,20 38:21,
22 39:4 41:7 42:14 43:6
45:21 51:2

---

**J**

**James**
3:5,23 4:14,15 6:20 33:1
53:24

**Jeff**
30:25 31:12

**Jeffrey**
33:9 51:1

**Jim**
4:15,16

**job**
5:4 10:20 25:13

**Jordan**
3:10

**Jose**
30:21

**June**
51:1

---

**K**

**K-L-O-H-N**
4:14

**Kerr**
33:20

**kind**
8:24 20:17 23:23,24

**Klohn**
3:5,23 4:14 6:20 16:12
24:21 50:20 53:6,24

**knew**
24:24 25:19

**know**
4:25 5:11,16 11:4 13:5
19:24 20:13 21:3,22 22:8
24:2,3,5 25:3,7,13 30:20,
23 31:2,7,15,24 35:1,4,
15 39:10 40:16 41:7
42:3,6,7,24 50:3,13 54:6

**knowledge**
11:25 12:1,2,10 38:11
41:20 42:23 44:10

**knows**
42:14

---

**L**

**L.L.L.P.**
7:18 8:13

**label**
45:16 46:7

**Laird**
32:14

**Lansing**
9:10

**late**
11:11,22 12:11

**law**

3:19 6:18 9:9,10,12,14,
16 10:6 22:9 42:1 43:19
45:9 47:6 50:21 51:1,7,
19

**lawsuits**
5:25

**lawyer**
8:8,25 18:24 20:12 23:11
35:17

**lawyers**
33:12

**lay**
12:2,3

**leading**
52:21 53:4

**learn**
35:11

**leave**
12:21 14:1

**led**
14:9

**left**
47:22 50:24

**legal**
17:14,16,19,20,25 18:8
20:16

**legality**
43:1,2,5

**Leslie**
32:17

**let's**
6:13 24:10,16 49:1

**letter**
47:19 48:1,7,12 50:25
51:3,11

**letters**
18:13

**license**
10:11

**licensed**
9:2,6

**licenses**
9:4

**limited**
3:6 29:20,22 40:20

**list**
44:8,16,18,23,24 45:1,6
51:11

**listening**
4:9

**litigate**
19:11

**litigation**
18:25 19:7

**little**
4:20 12:3 38:3,21,23
41:8

**LLC**
7:10,19

**local**
16:19 19:17 20:4 21:9,24
22:5,16 24:8 30:16 51:13

**located**
3:13 6:22 40:25

**location**
26:2

**lone**
26:22

**long**
6:24 7:11 45:23

**longer**
15:7

**looked**
22:6 38:21

**looking**
12:20 14:1,16

**looks**
17:5 38:23

**lot**
29:20

**lottery**
8:6 10:12

**loud**
4:24

**low**
10:13

---

**M**

**mail**

45:14 46:4

**mailed**
51:4

**making**
21:6,8,12

**Management**
8:15

**marked**
16:9 38:6,9 50:23 51:8

**marriage**
28:4

**Martinez**
32:20

**master**
44:8,12 45:6

**matter**
3:5

**mean**
7:8 10:15 20:14 27:20
29:25 37:5 39:6,23 40:15
41:7,23 42:13 49:22

**meaning**
13:11

**media**
3:4

**member**
11:20

**mentioned**
12:25 47:3

**message**
47:22

**mic**
6:4

**Michigan**
9:11,20,23

**Middle**
3:8

**mind**
19:12 29:7

**Miriam**
33:3

**missed**
39:23

**missing**

40:1,6

**Mitchell**
3:6,19 11:1 17:10,11
21:25

**Monday**
43:24

**month**
39:9 40:14

**monthly**
39:4,7

**morning**
50:20

**move**
38:5

**moved**
9:16 10:11

**Murphy**
30:25 31:12

**mutual**
36:16

---

**N**

**name**
4:13 25:20 26:10,11
29:16,19 38:12

**names**
27:1 30:19

**nature**
5:25 17:14,17,20,25
24:19 29:20 31:5

**necessarily**
20:20

**need**
5:11 6:4 13:14 16:5
20:20 25:10,22 28:23
38:2 41:10

**needed**
20:4,7 28:17,22 47:3

**never**
9:22 12:25 31:13 34:4
35:8 43:5,6,11,14 46:20
47:23,24 48:20 53:15,18,
20

**new**
3:17 4:3,10,12 6:4,8 13:6

16:4,11 17:6,7 18:6 19:4,
6 23:15,23 36:3,11,15,20
38:8 39:21 42:15 45:5
49:1,7,24 50:8,17 51:14
52:21 53:4,10,13,21 54:5

**New's**
52:14

**nomenclature**
31:25

**non**
48:20

**non-acceptance**
48:18,22

**Nope**
21:21

**Noreen**
33:7

**normally**
41:11

**notarization**
36:25

**Notice**
48:20,22

**notices**
48:17

**notwithstanding**
48:12

**November**
3:9 9:8

**number**
26:3,5 31:25 39:19
41:15,16,18,21,22 51:25

**numbers**
31:21

**numerous**
44:25

---

**O**

**object**
35:25 36:7,13,18 42:10
45:3 50:5

**objected**
52:17

**objecting**
36:2

**objection**
18:2 19:3 49:21 52:4,21
53:4

**objections**
53:2

**obtain**
41:5

**Obviously**
4:21

**occasions**
28:18 30:7 37:21,24,25

**offers**
26:24

**office**
10:2 21:10,16,25 24:18
26:20 27:11,14 28:11,15,
25 29:8 31:14,16 37:3,7,
23 44:3 46:11 47:1 49:8

**Oh**
40:19

**okay**
5:21 17:6 21:16 30:25
39:8 51:6,11 52:13 53:6

**old**
9:19 38:5

**once**
24:8 26:18 27:4 31:3
37:2 45:9 48:18

**one-off**
10:20

**one-time**
7:8

**ones**
8:11,12,17 39:21

**ongoing**
7:9 43:19

**open**
26:23

**operating**
6:24

**operator**
3:10

**opposed**
44:17

**order**

18:25 27:18 54:4,5

**original**
14:18 28:3

**originally**
27:8

**Ortega**
33:16

**Osceola**
3:13

**outset**
46:16

**owned**
28:7

**owner**
12:5 14:8,20 25:1

**owners**
14:19

─────────────
**P**

**P.A.**
6:21

**package**
20:15

**page**
26:3,4 50:25

**paid**
15:11,17 22:4,8,10 41:4,
7 45:10,16

**Paper**
45:12

**papers**
27:25

**paperwork**
28:5

**parcel**
26:5

**Parkway**
10:4

**part**
8:15 10:16

**parties**
15:20 54:9

**pass**
50:17 53:21

**passed**
27:23

**paying**
41:14

**PDF**
46:6

**people**
10:16 14:1,5 15:7 21:15
28:6 34:11 45:1 46:22

**people's**
30:19

**Perfect**
5:7

**performed**
47:7

**period**
39:4,5,12 40:2

**person**
12:4 16:7 26:10,11 27:7
29:11,14 38:13

**person's**
12:2

**personal**
11:25 12:1

**personally**
26:19,23

**pertained**
52:1

**pertinent**
28:1

**Peyton**
32:12

**phenomenon**
13:7

**phone**
4:4,6,7,10 21:12

**phonetic**
32:15 33:9 39:1

**place**
3:12 25:19 29:5

**Plaintiff**
3:24

**plaintiff's**
16:9 38:6 51:7

**plaintiffs**
3:17 51:2

**planning**
9:23

**please**
3:15,21 4:13 5:16 24:21,
22 29:2

**point**
25:15

**positions**
7:5,7,25

**possession**
26:15

**practice**
6:19

**predated**
7:23

**predicate**
19:3

**preparation**
41:19

**prepare**
13:14,17 24:25 25:10
28:19 30:3 41:3,6 45:1,2
48:6,12

**prepared**
21:3 22:4 25:4 27:5
33:24 34:4 37:2,18
38:13,15 39:3,19 40:17
42:5 43:21 44:4,6,14,18
45:7 46:10 48:18 49:19
50:10 51:3,25 52:25
53:14

**preparing**
11:15 20:23 25:5 26:19
34:8,14 35:17 38:18
44:17 48:4 49:10,13 50:4

**present**
7:2

**presume**
22:2

**presumed**
13:25

**presuming**
29:25

**presupposes**

17:19

**pretty**
23:22

**primary**
8:5 29:14

**principal**
49:20

**printed**
38:22

**prior**
8:4 11:13,24 14:13,17
19:21 23:20 26:3 27:20
28:3,7 37:13

**private**
24:7,22

**privilege**
17:2,8,9 19:1,9,14 23:10,
13,14 52:5,17,19 53:3

**privileged**
18:12

**probably**
20:19

**process**
14:23 27:5

**processes**
22:24

**processing**
26:25

**produce**
51:13

**produced**
22:9 39:10 40:6 46:11

**producing**
53:2

**product**
17:5,6 46:12

**property**
26:1,11 27:3 31:9 36:5
38:12 42:8 47:4 48:19

**proprietary**
22:24

**proprietor**
6:20

**proprietorship**
6:25 7:4,23 8:5

JAMES KLOHN, ESQ - 11/05/2018                    i10

**protected**
46:12

**prototype**
21:1,3 25:16

**provide**
13:16 39:2

**provided**
6:1 13:24 14:14,15,17
16:23 17:15 21:1 22:19

**Provident**
7:19,23

**providing**
17:19,20,24 18:8 52:15

**provision**
22:17,21

**purchasing**
14:5

**purposes**
23:17

**pursuant**
18:21 19:25

**put**
6:4 52:16

---

                    **Q**

**question**
5:5,16,17,20 17:24 22:18
23:12 35:7 41:8 42:3
52:13 53:11

**questioning**
52:14

**questions**
4:24 30:3 36:21 50:22
51:24

**quick**
4:3 49:1 53:10

**quitclaim**
12:17 13:14,17 15:16
17:21 18:4 20:15,17
24:21,25 43:4,22

**quote**
20:20

---

                    **R**

**ranger**
26:22

**rare**
28:20

**Raul**
32:20

**raven**
31:21 32:1

**read**
49:15 54:1

**reading**
21:10 54:11

**real**
4:3 11:21 21:8 26:7 36:5
38:12 42:8 48:19 53:10

**really**
16:3 29:11 35:14

**reason**
4:23 5:11,16 31:17 37:4
43:6 45:4

**recall**
11:7 12:15 13:25 15:23
18:10 21:5 22:22 24:20
29:13 39:12

**receive**
27:18 28:14,18 44:23
46:23

**received**
25:15 27:23 47:6,10,19

**receiving**
28:10 35:13

**recipients**
34:12

**recital**
41:14,19 42:13,16

**recite**
41:3

**recollections**
13:8

**record**
3:3 4:13 27:13 36:2 44:5
46:9 49:3,5 53:25

**recorded**
35:5,8 38:12 48:19 49:19
50:11 51:25

**recording**
21:20 26:3 34:23 36:25
37:5

**records**
38:12 48:19

**REDIRECT**
53:12

**Reed**
3:7

**referring**
14:20 18:13

**reflect**
39:18

**regard**
52:10

**Regarding**
15:25

**related**
6:9 8:22 31:9 47:11

**relates**
27:19 43:16

**relating**
8:2 30:10 47:7

**relationship**
14:25 15:3,10,24 16:1
19:18 30:8 43:18 46:17
52:10,25

**relatively**
13:6

**remain**
24:7

**remember**
5:15 13:10 21:7 29:17,19
31:5

**repeat**
30:11

**rephrase**
5:17

**reported**
43:14

**reporter**
3:11,20 4:22 54:4

**Reporting**
3:12,13

**reports**
43:7,10,12

**represent**
3:16 50:21

**representing**
23:17 51:2

**request**
28:17 47:10 48:9

**requested**
18:20 51:12,24

**requests**
17:3 47:6

**requirements**
35:19

**research**
35:18

**Resorts**
3:6

**respect**
42:4

**respective**
54:9

**respond**
23:8

**responding**
23:2,5 46:18

**response**
16:16,19,24 17:2 23:3
39:10,22 40:6,10 47:20
51:7,23 52:16,17

**responsible**
21:17,19 34:23

**reviewed**
21:1,5 25:16

**revise**
31:3

**right**
6:13 17:3 25:24 26:25
45:1,16 51:6,15,21 52:5
54:1

**Robert**
33:20

**Robin**
3:11

**rough**
39:6,7 40:15

**rule**
4:19 28:13

---

**S**

**safe**
20:18 43:6

**Salzman**
39:1

**saying**
4:25 27:22 48:23

**says**
4:23 21:9,24 52:4

**school**
9:9,10,13,15,16,18 10:6
42:1

**scratch**
52:3

**secrets**
22:24

**see**
13:4 41:1 50:7,22

**seeing**
12:21 13:2

**seeking**
11:7

**seen**
48:9

**self**
6:16

**self-employed**
6:17

**send**
27:6 29:1,2 30:4 37:9,10,
25 45:15 46:1

**sending**
26:20 28:8 29:8

**sends**
30:2

**sense**
14:3,6

**sent**
27:14 30:23 35:8 37:2,3,
6,18,22 44:25 46:10 51:6
53:15

**separate**
7:3 17:23

**serve**
51:18

**served**
16:14

**services**
17:24 18:1 51:19

**serving**
6:10

**set**
30:9,16 45:19

**setting**
14:24 15:2,9,24

**settlement**
8:6

**settlements**
7:19 10:12

**shakes**
4:25

**share**
14:6 27:16

**shares**
8:2

**she's**
29:25

**short**
49:4

**showing**
38:9

**Sibilla**
33:1

**sign**
36:9

**signature**
51:3 54:10

**signed**
14:1 25:7 42:6

**significant**
7:6

**signing**
13:21 36:25

**silly**
35:7

**similar**
33:12

**Similarly**
43:11

**simple**
41:12

**simply**
44:24

**single**
24:10

**sit**
13:8 23:16

**situations**
30:14

**small**
44:13

**smoother**
4:20

**sole**
6:20,24 7:4,23 8:4

**solely**
25:12

**somebody**
24:17 27:10 31:13

**Sorry**
16:4

**sort**
12:1 29:9 35:18 37:16
39:2 44:23

**sound**
32:7,10,13,16,19,21,23,
25 33:2,4,6,8,10 35:7

**Sounds**
33:21

**source**
35:11 48:16

**Southeast**
3:13 10:4 41:1

**speaking**
35:23 38:14

**specific**
6:18 7:24 8:10 12:18,25
13:20 14:9 19:12 40:20

**specifics**
25:22

**speed**
23:24

**spotted**
37:17

**spreadsheet**
44:8,13

**stack**
40:2 50:22

**Stanford**
32:9

**start**
4:3 24:16

**starting**
11:13 23:21

**state**
4:13 9:2 20:12 35:19
36:4 38:1 40:18

**statements**
13:23

**stating**
31:1

**staying**
9:22

**Stern**
33:18

**Steve**
32:11

**STIPULATED**
54:8

**straight**
9:12

**Street**
3:14

**stretching**
38:3

**structured**
7:10,19 8:6 10:12

**Stuart**
3:14 6:22 10:4

**stuff**
10:15

**subject**
22:20

**submitted**
16:21

**subpoena**
16:13,17,24 17:3 18:20
23:2 30:10,13 39:10,16
40:7,10 46:18 51:7,23
52:16

**subsequent**
19:21

**substance**
24:20

**substantive**
21:8

**suggested**
44:23

**Summer**
33:13

**supposed**
44:17 45:2

**Supreme**
20:22

**sure**
13:4 19:2,5 21:2,7 27:15
30:12,24 31:1,11 35:21
36:14,19 42:21 48:14,15

**surrounding**
15:4

**suspect**
5:8

**Sussman**
3:7,19 4:4,7,8 11:2,4,10,
14,22 12:8,11,23 13:12,
19 14:15,24 15:9,23
16:2,21 17:10,11,15
18:4,8,12 19:19,25 20:3,
24 22:9,19 23:4,25 24:9,
16 25:16 28:10 29:24
30:8,15 33:13,25 34:5,20
36:23 39:4 40:7,11
41:16,23 43:1,19,23 45:9
46:10,15 47:8,15 49:8
50:21 51:19

**Sussman's**

17:12,25 18:17 21:13,15,
16,25 23:11 27:11,14,17
28:15,25 29:8 31:14,20
37:3,7,23 44:3 46:21,24
47:1 49:16 51:21 52:1,8
53:14,15

**swear**
3:21

**sworn**
3:25

**system**
37:16

─────────────

**T**

**t-v**
31:21 32:1

**take**
5:12 8:12 9:20 38:4
45:23 49:1

**taken**
3:5,7 42:1 49:4

**talk**
5:3 6:13 13:11,12 23:20
24:10 34:20

**talked**
13:18 14:24 23:6 46:17

**talking**
5:6 13:18 24:5

**task**
24:12

**tasks**
21:11

**Team**
12:24 13:3

**technical**
31:3,6 47:3

**telephone**
12:12,14

**telephonic**
18:15

**tell**
5:17,18 10:23 12:18,23
37:9 41:21

**ten**
41:12 45:21

**tends**
4:21

**terms**
22:8 46:14

**Terri**
33:5

**testified**
4:1 20:12 49:18 50:3

**testimony**
5:23 6:1

**thank**
53:6

**thanks**
53:22

**there's**
39:20 42:22

**they're**
8:17 33:21

**thing**
5:14

**things**
24:7 26:7,12 33:12 35:22

**think**
4:4 5:9 6:6 13:1 16:5,25
20:6,18,20 22:3 30:18
31:1,2,11,18 34:10
39:14,24 43:18 44:1,11
48:5,8 52:13

**Thomas**
9:10

**thought**
38:1

**three**
28:6 45:25 51:25

**Thursday**
43:25

**time**
3:9 5:3,6 8:2 11:13,20
13:1,4 14:3,6 24:10,11
27:16 37:6 39:12,22
40:24 43:21

**times**
5:22 28:20

**timeshare**
8:22 12:5,8,9,20,21,24
13:3 14:2,4,8,11,18,19,

20 24:25 25:1,2 26:4,5
27:17 34:1,5,16 35:9,12
40:25 47:13 48:17,22
49:9,12 52:1

**timesharers**
13:15

**timeshares**
8:1,19 11:24

**timing**
48:15

**title**
11:20 35:22 36:16

**today**
5:15 13:8 22:12 23:16
43:24 51:21 52:20

**Today's**
3:8

**told**
4:4 17:18 22:3 24:3 37:7
41:17 43:18 47:13 49:25
50:1

**Tom**
32:8

**topics**
18:7

**touch**
11:10,22 12:11 21:17

**transcript**
49:16

**transfer**
8:7 14:11 24:25 34:1
36:17 42:8

**transferees**
43:15

**transferors**
43:15

**transferred**
13:13 14:4 26:8

**transferring**
34:5

**transfers**
15:4

**translate**
5:1

**true**

6:2 20:13 53:3

**TV**
13:7

**tweaks**
47:3

**two**
12:15 32:1 39:24 40:5
45:25 48:9,11

**two-year**
40:2

**type**
5:24 8:1 13:24 14:16
18:14 31:24

**types**
10:22 12:19 18:11 19:13
37:12

---

**U**

**U.S.**
3:7

**uh-huhs**
4:24

**uh-uhs**
4:24

**Um**
31:17

**understand**
5:15,18,19 31:21 33:11
48:23

**understanding**
17:1 18:24 21:13 29:23
31:22 37:12

**undertake**
34:15

**Underwood**
32:24

**unit**
26:4 31:7

**unquote**
20:20

**untrue**
20:13

**update**
39:20

**use**
25:19 38:17 41:17,22
42:2

**usually**
28:20 40:24 45:15,21,23

---

**V**

**valid**
35:19 36:4 42:14,22

**validly**
42:8

**various**
6:7

**verify**
20:9 34:15

**versus**
3:6

**video**
3:3,10 53:24

**VIDEOGRAPHER**
3:3,20 49:3,5 53:8,23

**videotaped**
3:4

**viewing**
14:13

**volume**
39:3 40:13

---

**W**

**wait**
45:21

**waive**
54:2,3

**waived**
54:11

**Walker**
3:11

**want**
5:14 15:8 19:11 50:2
54:6

**wanted**
20:4 37:8

**wasn't**

14:23 36:24

**way**
5:5 10:18 31:15 37:17
38:22 51:7 52:11

**we'll**
5:9,11

**we're**
5:5 53:24

**Weaver**
32:6

**Wednesday**
43:24

**week**
26:4 31:7 45:22

**weekend**
24:4

**weekly**
45:20

**went**
9:14 35:21

**weren't**
28:16 34:23

**Westgate**
3:6

**what's**
38:9 43:24

**wife**
9:18 27:22

**Williams**
33:14

**withholding**
19:13

**witness**
3:21,24 4:2 6:5 18:4 19:5
23:11,14 36:9,14,19
42:12 45:4 49:22 50:6,
16,17 52:22 53:5,21
54:3,9,10

**Wood**
7:10

**word**
26:23,24

**work**
7:9,11 8:1,6,10 10:12,14,
19,22 11:1,14,17 12:7

17:5,6 19:24 20:5 21:22
22:10 23:25 33:25 34:5,8
36:22 40:11 43:22 46:12
47:7,11,14 52:9,11

**work-product**
18:21 19:1,8,14 23:10,13
52:5,16

**working**
11:18 19:18 20:11 22:12
29:7

**works**
21:14

**wouldn't**
37:9,25 42:12 44:11,20

**write**
5:6

**writing**
4:22

**written**
19:18 47:19 51:23

**wrong**
31:8 37:10

---

**Y**

**Yanni**
29:16,24

**yeah**
10:15 13:10 14:13 15:18
23:6 26:17 28:6 29:19
31:23 35:16 37:20 45:13
47:18 48:5,13 54:5

**yearly**
39:5

**years**
7:12,13 9:19

**you'd**
31:13

**you'll**
5:4

**you're**
4:25 5:3 6:16 14:20 16:5
17:9 22:12 25:5 40:1,25
41:24 45:2 46:11 47:14
48:4,14

**you've**
4:21 10:23 22:8,10 27:5

JAMES KLOHN, ESQ - 11/05/2018      i14

40:10 43:18 44:4,5 45:7
48:18 49:25 50:10 51:20

---

**Z**

---

**zero**
 50:13
**Zoom**
 20:16,17